```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
     UNITED STATES OF AMERICA,      )  CRIMINAL NO. 03-00248DAE
 4                                  )
                  Plaintiff,        )  Honolulu, Hawaii
 5                                  )  May 2, 2007
            vs.                     )  10:37 a.m.
 6                                  )
     SAMUEL K. KAAUWAI, III,        )  MOTION TO WITHDRAW GUILTY
 7                                  )  PLEA BY SAMUEL M. KAAUWAI,
                  Defendant.        )  III
 8   _____   )

 9
                    TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE DAVID ALAN EZRA
                 UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
        For the Government:       MARSHALL H. SILVERBERG, ESQ.
13                                Office of the United States Attorney
                                  PJKK Federal Building
14                                300 Ala Moana Blvd., Suite 6100
                                  Honolulu, Hawaii 96850
15

16      For the Defendant:        PAMELA E. TAMASHIRO, ESQ.
                                  Law Office of Pamela E. Tamashiro
17                                Ocean View Center
                                  707 Richards Street, PH 7
18                                Honolulu, Hawaii  96813

19

20      Official Court            Cynthia Fazio, RMR, CRR
        Reporter:                 United States District Court
21                                P.O. Box 50131
                                  Honolulu, Hawaii 96850
22

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```



EXHIBIT 3

1                          I N D E X

2    GOVERNMENT'S WITNESSES:                          Page No.

3    WILLIAM DOMINGO
       DIRECT EXAMINATION BY MR. SILVERBERG...........    9
4      CROSS-EXAMINATION BY MS. TAMASHIRO.............   12
       REDIRECT EXAMINATION BY MR. SILVERBERG.........   24
5

6    DEFENDANT'S WITNESSES:

7    SAMUEL KAAUWAI, III
       DIRECT EXAMINATION BY MS. TAMASHIRO............   26
8

9

10

11                          EXHIBITS

12   GOVERNMENT'S:

13     13 & 14 were received in evidence...............    9

14   DEFENDANT'S:

15     D was received in evidence.....................   30

16

17

18

19

20

21

22

23

24

25

```
 1   WEDNESDAY, MAY 2, 2007                     10:37 A.M.
 2            THE CLERK:  Calling Criminal Number 03-248DAE, United
 3   States of America versus defendant Samuel Kaauwai.
 4            This case is called for a Motion to Withdraw Guilty
 5   Plea.
 6            Counsel, please state your names for the record.
 7            MR. SILVERBERG:  Good morning, Your Honor.  Marshall
 8   Silverberg on behalf of the United States.  With me is Special
 9   Agent Ty Torco.
10            THE COURT:  Okay.
11            MS. TAMASHIRO:  And good morning, Your Honor.
12   Mr. Samuel Kaauwai is present with counsel Pamela Tamashiro.
13            THE COURT:  All right.  Okay.  Ready to proceed?
14            MR. SILVERBERG:  Yes, we are, Your Honor.  We're not
15   exactly sure how the court wants to proceed.  It is their
16   motion and we do have -- I believe there will be three
17   witnesses.
18            THE COURT:  Three?
19            MR. SILVERBERG:  Well, we were hoping to do some by
20   stip, but it doesn't look possible at this point, so...
21            THE COURT:  Who are the three witnesses?
22            MR. SILVERBERG:  Special Agent Torco, who's sitting
23   next to me; Attorney William --
24            THE COURT:  Give me -- why don't you do this, it'll be
25   a little easier:  Why don't you give me a --
```

1              MR. SILVERBERG:  A summary, a proffer?

2              THE COURT:  Offer of proof.  Yeah, proffer as to what

3     they're going to be testifying.

4              MR. SILVERBERG:  Okay.  Along those lines, Your Honor,

5     we have two additional exhibits.  I've given them to

6     Ms. Tamashiro.  (Handing documents).

7              The first exhibit, 13, does not involve any testimony.

8     One of the arguments that Ms. Tamashiro makes is that the two

9     paragraphs in question, that is Paragraphs 20 and 21, are not

10    part of the practice of the United States Attorney's Office,

11    and that's simply not true.

12             I will make a representation to the court as an

13    officer of this court that I printed this out from our criminal

14    forms directory as an option in doing a plea agreement.  And

15    this is a standard provision in all of my plea agreements.

16    Assistant U.S. Attorney Tom Brady uses it, Assistant

17    U.S. Attorney Bev Sameshima --

18             THE COURT:  I've seen this provision before.

19             MR. SILVERBERG:  Right.

20             THE COURT:  Court takes judicial notice of the fact

21    that this particular paragraph is not in every plea agreement,

22    but it's certainly not unusual.

23             MR. SILVERBERG:  Okay.  Thank you, Your Honor.

24             And then as to the other exhibit, Exhibit 14, which

25    are hand written notes, those were done by Agent Torco after

1   debriefing the defendant on October 24th, 2003, a week after he
2   pleaded guilty.  During the course of that debriefing the
3   defendant admitted that he used the Beretta, that is the
4   handgun in question in this case, on at least two instances,
5   one involving a home invasion robbery which occurred before
6   Christmas of 2002; and the other he actually fired the weapon
7   involving a threat that was made inside of an apartment near
8   the Food Pantry on March of 2003 in which the defendant fired
9   one round to send a message to somebody in the apartment.  He
10  recovered the slug and the shell casing.
11        He also admitted during this debriefing that the
12  person he obtained the gun from is an individual by -- Thomas
13  Young.  He further admitted that he uses the -- he, the
14  defendant, uses the gun for protection and that Thomas -- that
15  Thomas Young or someone else removed the serial number before
16  he got the firearm.
17        The reason why we're offering this, Your Honor, is
18  that Ms. Tamashiro in her papers say that the defendant has
19  consistently maintained his innocence.  That is, that he did
20  not own or possess the gun in question.  And what we would use
21  Agent Torco's testimony is that a week after the defendant
22  pleaded guilty not only did the defendant admit that he
23  possessed the gun during the change of plea colloquy, but a
24  week later when he was hoping to cooperate and get a downward
25  departure motion, he admitted that he actually used the gun on

1   two occasions and he gave the identity of the person from whom

2   he obtained the gun in the first place.

3           So when Ms. Tamashiro says the defendant has always

4   maintained his innocence except for the time that he changed

5   his plea, that simply is not true.

6           THE COURT:  And how about Mr. Domingo?

7           MR. SILVERBERG:  Mr. Domingo was the defendant's

8   counsel during the change of plea colloquy.  Ms. Tamashiro's

9   papers say that Mr. Domingo coerced the defendant into pleading

10  guilty, and Mr. Domingo would counter that by saying that's

11  simply not true.  He went over the options with him, including

12  what motions they could file, he went over with him the

13  possible sentencing guideline sentences if he went to trial and

14  was found guilty versus pleading guilty, and his advice was to

15  plead guilty and the defendant pleaded guilty without any

16  coercion.

17          THE COURT:  All right.  You can be seated.

18          All right.  Ms. Tamashiro, you've heard the proffer of

19  the government.  Do you wish to have the government call those

20  witnesses and/or do you accept the proffer?

21          MS. TAMASHIRO:  Judge, with respect to Agent Torco, I

22  am willing to agree that that's what he would testify to if

23  called.

24          THE COURT:  Okay.  You want to cross-examine him?

25          MS. TAMASHIRO:  The only question I would ask would be

1    this -- that, you know, these notes were just turned over to

2    the defense today.  This is the first I've seen them.

3            THE COURT:  Okay.

4            MS. TAMASHIRO:  And so at the time that I wrote my

5    motion or my reply, I did not have this debriefing statement.

6            THE COURT:  No, but you had your client telling you

7    things and that's --

8            MS. TAMASHIRO:  Yes, I did.

9            THE COURT:  And that was what you relied on.  And

10   that's all you can rely on, I mean, after all.  But I don't

11   think that it was -- first of all, this would not normally be

12   required to be turned over at this stage in any event, but

13   secondly, I think that it was turned over at the late date

14   because that's when Mr. Silverberg received your client's

15   assertions.

16           So I mean, so I gather that you do not wish to

17   cross-examine him?

18           MS. TAMASHIRO:  I can't think of -- no, I don't need

19   to cross-examine him.

20           THE COURT:  All right.  What about Mr. Domingo, do you

21   wish to cross-examine Mr. Domingo?

22           MS. TAMASHIRO:  Yeah, I think I need to cross-examine

23   Mr. Domingo.

24           THE COURT:  All right.  Why don't you call Mr.

25   Domingo.  There's no need to call the agent and I don't -- what

1    was the other -- who was the other witness?

2           MR. SILVERBERG:  The third witness is Attorney Glenn

3    Choy.  I'm not really sure we need to call him.  The only

4    reason why I asked him to be here was to authenticate that the

5    letter that is part of the record that we produced earlier in

6    our memorandum, that is Exhibit 7, is a letter purportedly

7    signed by Mr. Kaauwai in which he admits or states that he does

8    not intend to seek to withdraw his guilty plea.

9           THE COURT:  You don't need to put him on.

10          MR. SILVERBERG:  All right.

11          THE COURT:  All right.  But why don't we call Mr.

12   Domingo to the stand then.  I have both parties' papers, so I

13   know what the, you know, the defendant's arguments are.  So why

14   don't you call Mr. Domingo.

15          MR. SILVERBERG:  Yes, Your Honor.  We call Mr.

16   Domingo.

17          THE COURT:  And I will trust that you will keep this

18   brief.  I don't see any need for any extensive examination.  I

19   don't want to go any further with the attorney-client privilege

20   waiver than we have to.

21                       WILLIAM DOMINGO,

22   called as a witness by the Government, having been first duly

23   sworn, was examined and testified as follows:

24          THE CLERK:  Please have a seat.

25          THE COURT:  By the way, I'll receive Exhibit 14 and

1    Exhibit 13 in evidence.

2        (Government's Exhibits 13 & 14 were received in evidence.)

3            MR. SILVERBERG:  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5    BY MR. SILVERBERG:

6    Q    Can you state your name, please?

7    A    William Domingo.

8    Q    And how are you presently employed?

9    A    I'm a solo practitioner doing defense work.

10   Q    Okay.  How long have you been an attorney?

11   A    Since 1985.

12   Q    Are you a member of the bar of the State of Hawaii?

13   A    Yes, I am.

14   Q    Was there a time when you were a member of the Public

15   Defender's Office?

16   A    Yes, I was.

17   Q    During that time period did you represent someone by the

18   name of Samuel Kaauwai?

19   A    Yes.

20   Q    And do you see him in the courtroom today?

21   A    I do.

22   Q    Okay.  Is it the defendant at counsel table?

23   A    Yeah, he's there with the blue shirt.

24            THE COURT:  Court would note the identification of the

25   defendant.

1    BY MR. SILVERBERG:

2    Q    Okay.  And were you representing Mr. Kaauwai on the day

3    that he pleaded guilty in court?

4    A    Yes.

5    Q    Okay.  Before he pleaded guilty, did you sit down and meet

6    with him?

7    A    Yes.

8    Q    Okay.  Do you recall generally the matters that you

9    discussed?

10   A    You want to go from the beginning of the case or right

11   before we --

12            THE COURT:  Just go right to the --

13   BY MR. SILVERBERG:

14   Q    Yeah, right in terms of the change of plea decision.  Did

15   you have discussions with him before he decided to plead

16   guilty?

17   A    Yes, we did.

18   Q    Okay.  And the nature of those discussions?

19   A    Well, defenses that he possibly had, any motions that he

20   could file, possible penalties that he could face if he was

21   found guilty by either trial or pled guilty, possibility of

22   cooperation, what type of cooperation that he would have.

23   Those types of things.

24   Q    Okay.  And was it your advice to him that he should plead

25   guilty?

1    A    Yes.

2    Q    At that time what was your understanding as to whether or

3    not he in fact was guilty of the charged offense?

4    A    Well --

5            MS. TAMASHIRO:  Objection.  That's irrelevant.

6            MR. SILVERBERG:  Well, she's making the argument he

7    should be allowed to withdraw because he's always maintained

8    his --

9            THE COURT:  Overruled.

10           THE WITNESS:  Yeah, well, prior to him pleading

11   guilty, I'm not going to let anybody plead guilty if they don't

12   admit to what.  And so we go over that.  There's a -- I believe

13   there was a paragraph, it's usually Paragraph 8, which talks

14   about the different facts that he needs to admit to in court.

15   So we went over that and he admitted that he did possess that

16   gun at that time.

17   BY MR. SILVERBERG:

18   Q    Okay.  So it was your understanding that the gun was the

19   defendant's gun?

20   A    Yes.

21   Q    Okay.  And did you coerce the defendant to pleading guilty

22   in any way?

23   A    No.

24   Q    Okay.  Did you twist his arm or anything of that nature?

25   A    No.

1    Q    Whose decision was it ultimately to plead guilty in this

2    case?

3    A    Mr. Kaauwai.

4         MR. SILVERBERG:  I have nothing further, Your Honor.

5         THE COURT:  Okay.  Cross?

6                        CROSS-EXAMINATION

7    BY MS. TAMASHIRO:

8    Q    Mr. Domingo, good morning.

9    A    Good morning.

10   Q    You know, do you recall going to a debriefing with

11   Mr. Kaauwai and Agent Torco on or about October 24th, 2003?

12   A    Yes.

13   Q    And you heard the representations as to what happened

14   there?

15   A    Yes.

16   Q    Do you -- I mean do you recall what happened with respect

17   to the --

18   A    Well, I don't have any personal recollections of

19   everything that happened, but from what I heard, and I was

20   there sitting, and that's pretty much what Mr. Kaauwai admitted

21   to.  You know, this is sometime after, I guess, the change of

22   plea that --

23        THE COURT:  When you say pretty much what he admitted

24   to, how about --

25        THE WITNESS:  Possession of the -- possession of the

1    Beretta.

2            THE COURT:  He did admit to your recollection that he

3    possessed the gun?

4            THE WITNESS:  Yes, Your Honor.

5    BY MS. TAMASHIRO:

6    Q    Okay.  And just some other questions.  Mr. Domingo, did

7    you ever receive either a written or audiotape recording of

8    Mr. Kaauwai's statement?

9    A    No.

10   Q    Okay.  And -- but you do recall that in the police reports

11   there was reference to a post-arrest statement?

12   A    Yes, I do.

13   Q    Okay.  Did you ever request it from the prosecutor?

14   A    I believe we have ongoing requests when I was at the

15   Public Defender's Office, but none was turned over.

16   Q    Okay.  And so it would be correct to say that even prior

17   to the change of plea you had never listened to Mr. Kaauwai's

18   statement to the police immediately upon his arrest or a day

19   after his arrest?

20   A    That's correct.

21   Q    Now, Mr. Domingo, I think the change of plea occurred on

22   October 17th, the indictment was returned in May of the same

23   year, 2003.  So it looks like the change of plea came about --

24   about 5 months after Mr. Kaauwai was indicted --

25   A    I believe so.

1    Q      -- does that sound about right?

2           You know, Mr. Kaauwai has written a letter to Judge

3    Ezra which is attached to my reply memo as Exhibit D.  I'm just

4    going to ask you some questions about --

5    A    Okay.

6    Q      -- you know, about what he says.

7           Mr. Kaauwai complains that your only advice to him and

8    instruction to him was that there are four witnesses against

9    him, that he is a convicted felon, and if he doesn't plead

10   guilty, the prosecutor is going to give him 15 to life.  Is

11   that the only advice that you gave Mr. Kaauwai?

12   A    We talked about the witnesses, we talked about who was

13   going to testify and what kind of elements they needed to

14   prove.  We also talked about possible penalties if he's found

15   guilty of this particular charge with his priors.  And when

16   you're talking 15 years, I was concerned that because he had a,

17   I believe, a burglary and also either a terroristic threatening

18   and also a Criminal Property Damage in the First Degree, that

19   they could trigger lock him.  So this whole time we talked

20   about that being a possibility.

21   Q    Okay.

22   A    He also was being held on a probation revocation by the --

23   by the State and he was there first and writted over to the

24   feds.  So our concern also was that he's not getting time for

25   any of these things, too.  But we talked about that, yeah.

1    Q    Okay.  Mr. Kaauwai complains that not once did you want to

2    hear his version of what happened.  Is that true?

3    A    No, that's not true.

4    Q    Okay.  You are aware of what Mr. Kaauwai's defense to the

5    case was or --

6    A    Well, I think initially he was saying that it was not his

7    gun and that was -- the bag belonged to Ms. Batara, I believe.

8    Q    Mr. Kaauwai also complains that your only focus when you

9    talked to him was to get him to plead guilty.  Is that true?

10   A    It's up to him as to whether or not he wants to go to

11   trial or not.  I was working at the Public Defender's Office at

12   that point.  We had the resources.  If we wanted to go to

13   trial, we could do that.

14   Q    Now, Mr. Kaauwai says that with respect to the plea

15   agreement that the only time you went over the plea agreement

16   with him was down in the marshal's office on the day of the

17   change of plea.  Is that correct?

18   A    I knew I went over with him that day also, but I believe I

19   went over it when we went out to the prison at some point

20   because I need to go over all the facts that we have and I

21   don't usually just do a one day thing before he goes and pleads

22   guilty.  So we talked back and forth about different facts that

23   were going to be within there, a cooperation clause, because he

24   wanted to see if he can get either cooperation by speaking with

25   the ATF or at that point he was bunkmates with Roy Frisbee who

1    was involved with some type big -- a big drug case and

2    Mr. Kaauwai said that, you know, he was convincing Mr. Frisbee

3    to plead and he was asking if he could get credit for that.  So

4    part of the cooperation would be through that.  We spoke with

5    Mr. Harrison who was Mr. Frisbee's attorney at that time and

6    they gave us assurances they would try to help in any way.  So

7    we talked about all of those things which would be encompassed

8    within a plea agreement.

9    Q    Mr. Kaauwai says that he wrote you a letter, I'm not sure

10   exactly when, about fingerprints and getting an independent or

11   a -- well, let me ask you this:  Did you ever tell Mr. Kaauwai

12   that his thumb print was found on a hotel room key?

13   A    I can't exactly remember all the facts, but we went over

14   the police reports which I had there, whatever reports they had

15   involved his particular case and what they found inside of his

16   bag, but we went over all of that.  And I remember talking

17   about a fingerprint, yes.

18   Q    You do remember talking about fingerprint --

19   A    Yeah, I believe so, yeah.

20   Q    Okay.  At the time that you were talking with Mr. Kaauwai,

21   were you aware of what his educational level was?

22   A    I believe he -- I don't think he graduated from high

23   school.

24   Q    Were you aware of whether he could read or write?

25   A    Yes, he could read and write.

1   Q    He -- that was your understanding?

2   A    Yeah.  In fact, he seemed really intelligent to me because

3   all the questions he was asking, all the things that he could

4   plan out as far as what options he had to go.

5   Q    Now, you -- I mean, because you didn't have a copy of

6   Mr. Kaauwai's post-arrest statement to the police, you never

7   filed a Motion to Suppress statement, correct?

8   A    No, I believe -- I don't even know that there was a

9   post-arrest statement, I don't -- I don't recall that.  If we

10  knew of, we probably would have requested it.  Because all I

11  know that he made some statements while he was arrested.

12       Wait, I'll take that back.  Yeah, in his statement he

13  talked about the gun belonging to -- or somebody else, that the

14  bag was his, some -- I remember that, yes, from the -- from the

15  police reports, yes.

16  Q    Okay.  But -- so no Motion to Suppress was filed to

17  suppress his statement?

18  A    No, I believe what I usually do is ask him were you

19  threatened before you made the statement, and if there is any

20  indication that there was anything regarding his education or

21  any type of coercion, then I would follow-up on that.  And this

22  case, I don't believe there was anything there.

23  Q    You had an opportunity to look at the photo --

24  photographic lineup that the complaining witness was shown?

25  A    Yes.

1  Q     Did you -- did you ever file a Motion to Suppress the

2  lineup because it was unduly suggestive?

3  A     Now that I think back on it, I don't recall anything that

4  stood out that would give me any cause to file anything like

5  that, yeah.

6  Q     And so with respect to the fingerprint, you never asked

7  for some kind of expert to review the report that was -- that

8  allegedly linked Mr. Kaauwai's fingerprints to an item in the

9  backpack?

10  A     No, we did not.

11  Q     With respect to the plea agreement, Mr. Domingo,

12  specifically Paragraphs 20 and 21.  20 is the one that says

13  that he agrees -- basically he agrees not to withdraw his plea.

14  Did you go over that particular provision with Mr. Kaauwai?

15  A     I believe we went over everything and then -- those

16  paragraphs are of concern because I believe Mr. Silverberg is

17  the one that uses it at that point and part of the deal was

18  that he wanted to do cooperation and, you know, we talked

19  about, you know, the government, this is their plea agreement,

20  this is something that you want to go through.  If you want to

21  go forward and complete your cooperation, then there shouldn't

22  be any problem here; but if you should not, then these are the

23  things you are agreeing to as far as any statement that you

24  make will be used if you pull out.

25  Q     Okay.

1    A    We talked about that, yes.

2    Q    So would it be correct to say, Mr. Domingo, though, that

3    Paragraphs 20 and 21, they're not always included in plea

4    agreements, correct?

5    A    That's correct.

6    Q    Did you ever try to negotiate with Mr. Silverberg deleting

7    the -- those two provisions?

8    A    Yes.

9    Q    And what was the result of your negotiations?

10   A    We -- I was not successful in trying to get that out

11   because otherwise there wouldn't have been a plea agreement,

12   there wouldn't be any chance for cooperation, and that's what

13   Mr. Kaauwai wanted.

14   Q    Now, after the change of plea there were, I believe, three

15   continuances of the sentencing?

16   A    Yes.

17   Q    And if I can just refresh your memory.  I guess the first

18   one was because Mr. Kaauwai wanted to get his GED?

19   A    Yes.

20   Q    And as far as you know, that was a legitimate desire on

21   his part that he did want to get his GED?

22   A    Yes, I believe he was either in classes or waiting for

23   C-base program or something like that.

24   Q    Okay.

25   A    And they had to wait for rotations to come around.

1    Q    Okay.  The next continuance was for the purpose, because

2    apparently you had a conflict, you were going to be in trial

3    in, I believe, Judge Mollway's courtroom and so sentencing was

4    continued again; you remember that?

5    A    I don't have a recollection, but I believe if I was in

6    trial then I did the motion, yes.

7    Q    Okay.  What about the draft presentence report, Mr.

8    Domingo, did you go over that with Mr. Kaauwai?

9    A    I believe so, yes.

10   Q    On August 8th, 2005, I believe, that's when you signed

11   your declaration anyway about -- in support of your Motion to

12   Withdraw as Counsel?

13   A    Yes.

14   Q    Okay.  And in that particular -- in your declaration you

15   noted that there was a conflict in the attorney-client

16   relationship?

17   A    Yes.

18   Q    And that you stated that Mr. Kaauwai was unsatisfied with

19   your representation and gave notice of his intention to

20   withdraw his guilty plea and to go to trial?

21   A    Yes.

22   Q    And that's back in August 8th, 2005?

23   A    I believe so, yes.

24   Q    Okay.  So -- so at least as of August 8th, 2005

25   Mr. Kaauwai was saying that he wanted to withdraw his plea?

1    A    I believe soon after, the day before either I saw him or

2    some kind of communication got back to me, that's when I

3    immediately filed it.  But in the meantime he was asking to see

4    if he could get watches back, which we did.  He also wanted to

5    see about getting back some $1,500 which was found on him which

6    the State had in connection with a robbery that was not brought

7    against Mr. Kaauwai.  So, during that whole process we were

8    doing that in the meantime.  And then the communication came to

9    me either through him directly when I went to visit him that he

10   was not satisfied with what I was doing at this point and

11   wanted to go back and go to trial on everything now.  So that's

12   when I filed it.

13   Q    Okay.  Mr. Domingo, when did you leave the Public

14   Defender's Office?

15   A    The federal?

16   Q    Yeah.

17   A    Yes.  January of 2005.

18   Q    Mr. Kaauwai says that it's his best recollection that

19   between the change of plea, except for the probation interview,

20   that you never came out to see him, between then and the time

21   that you moved to withdraw as counsel.  Is --

22   A    I don't recall having any purpose to see him except for

23   when the presentence report comes out so we can go over that in

24   preparation for sentencing.  Unless he calls me to -- to get

25   going, then I would do that.  At that time I think I was

1    starting my practice from January, so he was one of the cases

2    that the public defenders allowed me to take with me as far as

3    his sentencing situation.

4    Q    So --

5    A    That may be true.  Yes.

6    Q    At the time that you filed your August 8, 2005

7    declaration, though, I mean you did know that Mr. Kaauwai

8    wanted to go -- withdraw his guilty plea?

9    A    That's the reason because we had a conversation, I

10   believe, and I said that I can't file this for you because at

11   this point if I'm saying that I stood next to you and then when

12   the judge asks me that, is this something that you recommended,

13   I have to say yes.  And then to say now that either if -- I

14   don't know what he's going to allege, that I coerced him or

15   anything else, then I cannot be the attorney doing the

16   withdrawal.  So, I told him usually standard practice is I

17   withdraw from the case, we have another attorney come in and

18   independently talk to you and see what the basis for a motion

19   would be.

20             MS. TAMASHIRO:  Your Honor, I'm sorry I didn't file a

21   separate evidence or exhibit list, but I would ask the court

22   take judicial notice of my exhibits and that I may refer to

23   them and that they be --

24             THE COURT:  Which ones are these?

25             MS. TAMASHIRO:  I -- to the reply memo, A, B, C, D, E

1  F -- A through H.  And in particular, I guess with respect to

2  Mr. Domingo, Exhibit B is his motion for withdrawal of counsel

3  and the August 8th, 2005 declaration that I'm referring to.

4  It's part of the record and files, but --

5          THE COURT:  Okay.  Well, it's already in the record,

6  isn't it?

7          MS. TAMASHIRO:  Yes, it's a filing.

8          THE COURT:  And this is Mr. Kaauwai's letter, you want

9  me to --

10         MS. TAMASHIRO:  I'm sorry, Exhibit B to the reply memo

11  is Mr. Domingo's Motion to Withdraw as Counsel.

12         THE COURT:  That's fine.  It's -- I'll take judicial

13  notice of it.  It's in the record.

14         MS. TAMASHIRO:  If I may just have a moment, Judge.

15         THE COURT:  Yup.

16              (Counsel and client conferring.)

17  BY MS. TAMASHIRO:

18  Q   Mr. Domingo, just a few more questions.  If you know,

19  during the period when you advised Mr. Kaauwai to plead guilty,

20  do you know how many other clients you had at that time?

21  A   Would only be a guess, but --

22         THE COURT:  No, don't guess.

23         THE WITNESS:  Yeah, you know, I was with the Public

24  Defender's Office and usually about 25, 30 cases at the time.

25  BY MS. TAMASHIRO:

1   Q    Would it be fair to say that you could have been

2   overworked in working Mr. Kaauwai's case and that you coerced

3   him to plead guilty so -- to eliminate some of your case load?

4   A    No.

5   Q    Is there anything different that you would have done in

6   hindsight in looking at what you did in this particular case?

7   A    As far as going about with the case?

8   Q    Yes.

9   A    I don't believe so.

10           MS. TAMASHIRO:  I don't have any further questions,

11  Judge.

12           THE COURT:  Do you have anything for him, Mr.

13  Silverberg?

14           MR. SILVERBERG:  Just one question, Your Honor.

15           THE COURT:  All right.

16                          REDIRECT EXAMINATION

17  BY MR. SILVERBERG:

18  Q    You mentioned the robbery, the State robbery charge, Mr.

19  Domingo?

20  A    Yes.

21  Q    During the period when you sought those continuances, was

22  Mr. Kaauwai concerned about being charged in the State court

23  for those -- for the robbery?

24  A    Yes, he was very much concerned with that.  I consulted

25  with his public defender William Bento to see where that was in

1    the State system.  I also called up, I believe, the

2    Prosecutor's Office to see whether or not anything was going to

3    be brought there.  And once, I believe, we got -- not really

4    guarantees but assurances that if everything stayed in federal,

5    that the -- probably the robbery would not be brought in.  And

6    also there may have been problems with, I believe, Yancy, who

7    was the complainant in the case.

8    Q    So as long as he stayed in federal court with the federal

9    charges it was your understanding that he was not going to be

10   charged in the state court for the robbery?

11   A    Well, I didn't get any guarantees on that, but that's one

12   thing that was mentioned to us.

13   Q    And that -- did you convey that to Mr. Kaauwai?

14   A    Yes.

15            MR. SILVERBERG:  Okay.  Nothing further.

16            THE COURT:  All right.  You can step down.

17            THE WITNESS:  Thank you, Your Honor.

18                                        (Witness excused)

19            THE COURT:  All right.  Do you have any witnesses?

20            MS. TAMASHIRO:  Let me just talk to Mr. Kaauwai for a

21   minute.

22                 (Counsel and client conferring.)

23            MS. TAMASHIRO:  I'll call Mr. Kaauwai.

24            THE COURT:  All right.

25                      SAMUEL KAAUWAI, III,

1    the Defendant herein, called as a witness on his own behalf,

2    having been first duly sworn, was examined and testified as

3    follows:

4              THE CLERK:  Please have a seat.

5              State your name for the record and spell your last

6    name.

7              THE WITNESS:  My name is Samuel Maila Kaauwai, III.

8    My last name is spelled K-A-A-U-W-A-I.

9                        DIRECT EXAMINATION

10   BY MS. TAMASHIRO:

11   Q    Okay.  Mr. Kaauwai, can you just tell the judge briefly

12   how much education you've had?

13   A    I went to school up to tenth grade.  In between that I was

14   going to, how you say, alternative school.  I wasn't too good

15   in class and stuff as education.  I didn't have too much

16   education.

17   Q    At the time of this case back in October of 2003 how would

18   you describe your ability to read and write?

19   A    Like I explained to you, I could -- I can read, you know,

20   so much, but as for spelling, I'm not too good at spelling.

21   But I could understand certain things.

22   Q    Okay.  So are you better at reading English or writing

23   English?

24   A    Reading.

25   Q    Okay.  Do you have a hard time writing?

1  A    Yes.

2  Q    Okay.  Now, you have attempted to get your GED, right?

3  A    Yes.

4  Q    And then can you just briefly describe what your efforts

5  have been in that respect?

6  A    After my plea agreement I thought it would be a good idea

7  to try to show the judge that I have accomplished my education

8  while in FDC.  In the course of doing that I failed two times.

9  I brought it to Mr. Domingo's attention that I wanted to take

10 it again.  But there's a rotation because pretrial guys ain't

11 priority, sentenced people are.

12 Q    In terms of attending GED classes?

13 A    Yes.  So I would have to wait until the rotation is

14 available.

15 Q    As a result of taking GED classes, though, has your

16 ability to read and write gotten better?

17 A    I can say yes, but, you know, to me to understand the

18 federal law had made me look much more -- understand it little

19 more with the education.

20 Q    Okay.  So did you receive a copy of the police reports in

21 this case from Mr. Domingo?

22 A    I got it through the mail, my discovery, if that's what

23 you're saying.

24 Q    Okay.  Do you remember how many pages your discovery was?

25 A    Jeez, I think it was like two telephone books put

1   together.

2   Q    Did you bring it with you to court?

3   A    Yes, ma'am.  It's on the desk.

4   Q    Okay.  If I were to show you the last page would that

5   refresh your memory about how many pages the discovery

6   consisted of that you received from Mr. Domingo?

7   A    Yes.

8           MS. TAMASHIRO:  Judge, may I approach the witness?

9           THE COURT:  (Nods head up and down).

10          MS. TAMASHIRO:  And, Your Honor, may the record

11  reflect that I'm holding a ream of -- or some papers that look

12  to be approximately 2 inches in -- 2 inches.

13  BY MS. TAMASHIRO:

14  Q    So, Mr. Kaauwai, can you take a look at that.  And how

15  many pages were in that discovery that you initially received?

16  A    From zero -- from 01 to 438 pages.

17  Q    Okay.  Now, after receiving that -- your discovery, did

18  you try and read through it?

19  A    I was kind of shocked to have something this thick on a

20  case.  As going through it, I didn't understand what it was --

21  a lot about it.

22  Q    Why is that?

23  A    To me it seemed like going quarter ways through it, it

24  seems like lot of the stuff was the same thing over and over

25  again.  And I brought that attention to Mr. Domingo hoping he

1    could explain why is my discovery so thick like this and going

2    quarter ways through it there's a lot of things that look the

3    same to me.

4    Q    In that discovery that you're holding up there, is there a

5    transcript or any kind of writing about what -- of your

6    statement to the police after your arrest?

7    A    Well, since you're saying that, that was the first thing

8    that I would -- I was looking for that I did not see as

9    statement-wise in here.

10   Q    Okay.  Did you ever receive or listen to any audiotape of

11   your statement to police?

12   A    No.

13   Q    You did give a statement to the police after your arrest?

14   A    Yes, I did.

15   Q    Mr. Kaauwai, I'm going to now -- you wrote a couple

16   letters in support of your motion to withdraw; you remember

17   that?

18   A    Yes, ma'am.

19   Q    Okay.

20        MS. TAMASHIRO:  And, Your Honor, I'm referring to what

21   has been attached to my reply brief as Exhibit D and it's a

22   three-page -- three pages.  May I approach the witness to have

23   him --

24        THE COURT:  Yes.

25   BY MS. TAMASHIRO:

1   Q    Mr. Kaauwai, you recognize what the three pages are?

2   A    Yes, ma'am, I do.

3   Q    And what are they?

4   A    They was letters to my attorney and Honorable Ezra to --

5   concerning my -- my case.

6   Q    Okay.  And as far as, are the facts and circumstances

7   contained in both those letters true and correct to the best of

8   your information and belief, or your knowledge and belief?

9   A    Yes, it is.

10       MS. TAMASHIRO:  Your Honor, again, I'm sorry I don't

11  have it as an exhibit, but I would ask the court to allow me

12  maybe to supplement with some exhibits, what has been attached

13  to my memo as Exhibit D.

14       THE COURT:  He's identified that as his.  So I'll

15  receive it.

16       (Defendant's Exhibit D was received in evidence.)

17       MS. TAMASHIRO:  Okay.  Thank you, Judge.

18  BY MS. TAMASHIRO:

19  Q    What about fingerprint analysis, I mean did -- well, let

20  me -- in your letters, Mr. Kaauwai, you make some complaints

21  against Mr. Domingo about his representation of you.  Can you

22  just kind of briefly highlight for the judge what -- what you

23  said or your complaints?

24  A    It was a letter concerning my finger -- my latent prints

25  on certain items that was in the bag.  It was brought to my

1    attention with another inmate that had a similar case saying

2    that they should ask for an examination on your prints.  And

3    that's when I put together a letter writing it to Mr. Domingo

4    because it would be better documenting it on a letter, I was

5    told, saying that you showed and made effort on requesting to

6    have your fingerprints analysis redone or checked through a

7    private sector.  So that's -- that's the letter that I wrote to

8    Mr. Domingo.  I gave a copy to Mr. Clayton Kimoto, he's

9    supposed to have it in his -- in the files, and I have one, but

10   it's not with me at this time.

11   Q    All right.  Did you feel like -- did Mr. Domingo do

12   anything about the fingerprints?

13   A    From what I was told from him is that my plea agreement,

14   we had already pled guilty.  There's nothing more for him to

15   do.  It wouldn't be, like, right for us to go through with that

16   because I already pled guilty already.

17   Q    You remember how much after you pled guilty that you sent

18   him this letter about the fingerprints?

19   A    About 4 months after that.

20   Q    Okay.  So you pled guilty in October?

21   A    Somewhere in February.

22   Q    About February of 2004?

23   A    Yes, ma'am.

24   Q    What other -- I mean you think -- you've told -- you've

25   said that you believe Mr. Domingo didn't do a good job for you,

1    was ineffective.  Can you tell the judge why you say that?

2    A    I didn't have no knowledge of the federal law, federal

3    system, procedures, trial stuff.  I had some knowledge on how

4    state would operate.  And I asked Mr. Domingo, you know, I was

5    hoping that he could advocate certain things concerning my

6    case.  But he would put the guidelines in front of me and says

7    that if we go through, there's four witnesses, you're at

8    Category 6, you're at level 24, somebody like you going --

9    challenging the government and losing, you're looking 15 to

10    life.  The life part is the thing that got me scared, you know.

11         And from how he -- he showed me on the guidelines, he

12    said from here to here (indicating) is a stretch, like, you

13    know, and it looked reasonable.  So I -- you know, I thought

14    that was the best advice that he was giving me, you know.  But

15    throughout me taking my GED and looking into my case, I felt as

16    him being an attorney and he didn't do everything that he

17    should have done.

18    Q    So, Mr. Kaauwai, with respect to your discovery, did you

19    go through it and find, I mean, inconsistencies that --

20    throughout the report?

21    A    Oh, there's a -- you know, now I study this day in and day

22    out.  There's a lot that's inconsistent with this discovery.

23    Q    All right.  What about did Mr. Domingo explain to you

24    possible defenses or -- and if you could address that and then

25    the fact that you say that he didn't even want to hear your

1  version of what happened?

2  A    Well, because there was information that I had, that I had

3  brought to the attention of the -- of Mr. Domingo that --

4  regarding -- that I knew these things on the outside.  And --

5  and I explained to him and he said that will be our best way to

6  go instead of taking it to trial because that will help you

7  bring down your time.  And it made it feel much -- you know, a

8  little better saying okay, well, maybe that is, you know.  So

9  I -- we was talking about cooperating and debriefing.

10  Q    Okay.  Speaking of debriefing, Mr. Kaauwai, I showed you

11  this morning for the first time, isn't it correct, some

12  handwritten notes, which is Government's Exhibit 14 dated

13  October 24th, 2003?

14  A    Yes, you did.

15  Q    And this morning was the first time you've seen it?

16  A    Yes.

17  Q    You heard the offer of proof as to what Agent Torco would

18  testify to about some admissions that you allegedly made during

19  this debriefing?

20  A    Yes.

21  Q    What is your recollection as to what happened or what the

22  offer of proof was as far as, you know, your admissions about

23  the gun?

24  A    Like I asked you before the judge came in, I wanted you to

25  ask Mr. Domingo because when I looked at that, yes, there was

1    things that was said regarding robbery, other things, using a

2    firearm, but I -- I can't -- I didn't say a Beretta 380,

3    shooting a round and using it to -- home invasions.

4    Q    You didn't say it?

5    A    No, I didn't say it.

6    Q    Do you remember -- well, okay.  Mr. Kaauwai, you told --

7    would it be correct to say that you told all your attorneys --

8    I'm your sixth attorney, right?

9    A    Yes.

10   Q    Your five prior attorneys, did you tell them that you

11   wanted to withdraw your guilty plea, beginning with Mr.

12   Domingo?

13   A    Yes.

14   Q    Did you tell Mr. Silvert that you wanted to withdraw your

15   guilty plea?

16   A    We didn't get to that with Mr. Silvert.

17   Q    And why is that?

18   A    As soon as he found out that Mr. Domingo was my attorney,

19   he couldn't represent me he said.

20   Q    What about Mr. Clayton -- I mean Mr. Choy, Glenn Choy?

21   A    Yes.

22   Q    You told him that you wanted to withdraw your plea?

23   A    Yes.

24   Q    How about Mr. Clayton Kimoto, did you tell him that you

25   wanted to withdraw his plea -- that you wanted to withdraw your

1    plea?

2    A     Yes.

3    Q     Okay.  Mr. Kaauwai, on April 12th, 2006, do you remember

4    that you signed a -- you signed a statement which is attached

5    as Government's Exhibit Number 7?

6              MS. TAMASHIRO:  And may I approach, Your Honor?

7              THE COURT:  Yes.  Well, let's stop here for a minute.

8    I have another -- I was -- go to the podium, Ms. Tamashiro.

9              I had a matter scheduled for 11:15 today because I was

10   not made aware that we were going to be calling witnesses.  I

11   thought it was just simply an oral argument.  And those lawyers

12   are sitting here in the courtroom waiting.  And I think it's

13   grossly unfair to make them have to sit here while we continue

14   examination --

15             MS. TAMASHIRO:  All right.

16             THE COURT:  -- and then run out of time.  So I am

17   going to continue this matter until this afternoon at

18   3 o'clock.

19             MS. TAMASHIRO:  Okay.

20             THE COURT:  I imagine -- I was thinking about 2:30,

21   but I think we'll do it at three.  I don't think it's going to

22   take us more than another hour at most.  You're just about

23   done?

24             MS. TAMASHIRO:  I'm just about done.

25             THE COURT:  Yeah.  How much longer do you have,

1    direct?

2            MS. TAMASHIRO:  10 minutes, if that.

3            THE COURT:  No, I don't want to make them wait any

4    longer.

5            MS. TAMASHIRO:  Well, and then Mr. -- I'm sure he has

6    cross.

7            THE COURT:  Well, I'm sure that Mr. Silverberg has

8    20 minutes or so of cross, so...  And that's why I think it's

9    unfair.  I've got Mr. Tong and Ms. Faymonville sitting here.

10   So, we will resume at 3 o'clock this afternoon and we'll finish

11   it up this afternoon at three.

12           MS. TAMASHIRO:  All right.  Thank you, Your Honor.

13           (A recess was taken from 11:24 a.m. to 3:05 p.m.)

14           THE COURT:  All right.  Can I have appearances again,

15   please?

16           MR. SILVERBERG:  Yes, Your Honor.  Marshall Silverberg

17   on behalf of the United States.  With me is Special Agent Ty

18   Torco.

19           THE COURT:  All right.

20           MS. TAMASHIRO:  And good afternoon, Your Honor.

21   Samuel Kaauwai, III, is present with counsel Pamela Tamashiro.

22           THE COURT:  All right.  You ready to proceed?

23           MS. TAMASHIRO:  Your Honor, I believe at this time it

24   is our intention to withdraw our Motion to Withdraw Guilty

25   Plea.

1           Before we do that, Mr. Kaauwai would like to just
2   address the court briefly.
3           THE COURT:  About what?
4           MS. TAMASHIRO:  I guess about all this that's going
5   on.
6           THE COURT:  Well, let me ask him first, is it your
7   intention to withdraw your guilty plea?
8           THE DEFENDANT:  Yes, Your Honor, it is.
9           THE COURT:  Not your guilty plea, but your motion to
10  withdraw your guilty plea?
11          THE DEFENDANT:  Yes, Your Honor.
12          THE COURT:  All right.  So you understand that means
13  that you will go forward to sentencing.
14          THE DEFENDANT:  Yes, Your Honor.
15          THE COURT:  And you will be convicted, you understand
16  that?
17          THE DEFENDANT:  Yes, Your Honor.
18          THE COURT:  All right.  Has anybody coerced you or
19  intimidated you or threatened you in any way into making this
20  decision?
21          THE DEFENDANT:  No, Your Honor.
22          THE COURT:  Okay.  Have you -- do you feel like you
23  have received adequate advice and representation from your
24  lawyer?
25          THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  All right.  Now, you want to say
 2    something?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  You may do so.
 5              THE DEFENDANT:  I take full responsibility of my
 6    action and the charge against me.  I'm willing to accept the
 7    consequences of my charges.  I wish not to waste any more of
 8    the court's time; you, Your Honor, prosecutor Marshall
 9    Silverberg, ATF agent, and my attorney, Pamela Tamashiro.  I'm
10    doing this on my own free will and taking action of acceptance.
11              THE COURT:  All right.  All right.  The court will
12    deem the motion to be withdrawn.
13              Can we get a sentencing date, please?
14              MR. SILVERBERG:  Your Honor, obviously we have no
15    objection, but we would ask that it be done with prejudice
16    given the history of the case, given the defendant's propensity
17    of having new lawyers.  I'm afraid he's going to a week from
18    now change his mind, ask for a new lawyer and try and reinstate
19    the whole matter.
20              THE COURT:  Mr. Silverberg, I don't know that I have
21    authority to do it with prejudice to be honest with you.
22              MR. SILVERBERG:  I don't know why not.  But I'll defer
23    to the court.
24              THE COURT:  Well --
25              MR. SILVERBERG:  Well --
```

1          THE COURT:  This is not a civil case.  Why not?  We're

2    in the Ninth Circuit that's why not.

3          MR. SILVERBERG:  I would assume that was within the

4    court's discretion.  I mean given the fact we took testimony in

5    the case, the government didn't have a chance to cross-examine

6    the defendant.  Obviously we don't object to him withdrawing

7    the motion, but I think there's got to be some finality to this

8    thing.

9          THE COURT:  Well, if he attempts to refile his motion,

10   the court will rule on it in a very timely fashion I can assure

11   you.

12         All right.  Can we have a sentencing date, please?

13         THE CLERK:  May 30th, 2007, at 9:45 a.m.

14         MS. TAMASHIRO:  That's fine.

15         MR. SILVERBERG:  That's fine.

16         THE COURT:  Is it all right?  Okay.

17         THE DEFENDANT:  Thank you, Your Honor.

18         THE COURT:  All right.  Thank you very much.

19         MS. TAMASHIRO:  Thank you, Your Honor.

20         THE COURT:  We stand in recess.

21         (The proceedings concluded at 3:08 p.m., May 2, 2007.)

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3        I, CYNTHIA FAZIO, Official Court Reporter, United

4   States District Court, District of Hawaii, Honolulu, Hawaii, do

5   hereby certify that the foregoing pages numbered 1 through 39

6   is a correct transcript of the proceedings had in connection

7   with the above-entitled matter.

8

         DATED at Honolulu, Hawaii, May 15, 2007.

9

10

11                        /s/ Cynthia Fazio
                      CYNTHIA FAZIO, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25